[Cite as *Pelfrey v. Pelfrey*, 2026-Ohio-2205.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| BRIAN T. PELFREY | : | |
| | : | C.A. No. 2025-CA-81 |
| Appellant | : | |
| | : | Trial Court Case No. 21-DR-0219 |
| v. | : | |
| | : | (Appeal from Common Pleas Court- |
| JESSICA M. PELFREY | : | Domestic Relations) |
| | : | |
| Appellee | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 12, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and HANSEMAN, J., concur.

SAMUEL J. PETROFF, Attorney for Appellant
STACEY R. PAVLATOS, Attorney for Appellee

LEWIS, P.J.

{¶ 1} Plaintiff-appellant Brian T. Pelfrey ("Brian") appeals from a judgment of the Clark County Common Pleas Court, Domestic Relations Division, finding him in contempt of court of the final judgment and decree of divorce. For the following reasons, the judgment of the trial court is affirmed.

## I.    Procedural History

{¶ 2} Brian and Jessica M. Pelfrey ("Jessica") were married on May 19, 2001, and divorced on June 13, 2024. The parties entered into an agreed divorce decree, part of which set forth the allocation of personal property between the parties and their obligation to cooperate in facilitating the distribution of such property. Due to a clerical error, the agreed exhibits were not attached to the June 13, 2024 divorce decree ("divorce decree"), but were added to the decree through a June 21, 2024, nunc pro tunc entry.

{¶ 3} At issue in this appeal is the property identified in Exhibit V, which designated certain personal property to Jessica. Relevant here, the divorce decree states:

> **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that all items identified in attached Exhibit V are and shall remain the sole, separate property of the Defendant, without adjustment to her share of the marital assets. These items are acknowledged located at the marital residence or at the residence of the Plaintiff's parents. The Plaintiff is ordered to cooperate with the Defendant in securing those items.

2

Divorce decree, p. 7.

{¶ 4} During the pendency of the divorce proceedings, Brian maintained possession of the marital residence. The parties agreed to list the home for sale within 10 days of the filing of the divorce decree.

{¶ 5} On October 10, 2024, Jessica filed a motion for contempt and attorney fees, arguing that Brian failed to abide by the terms of the divorce decree to gather the items listed in Exhibit V that were designated for Jessica. A hearing on the motion was held on December 11, 2024.

{¶ 6} Jessica adduced evidence at the contempt hearing that, despite her multiple attempts to schedule a time to obtain her personal property, Brian responded that he would get it to her but never did. On June 17, 2024, Jessica and Brian walked through the home with the realtor to take photos of the home. At that time, Jessica did not see any of her property in the house. The home was sold at auction on July 26, 2024, and the closing date was September 5, 2024. Brian stated that at the end of July or early August, he moved some of Jessica's property from his parents' home to the barn at the marital residence. But he never informed Jessica that her property was in the barn.

{¶ 7} On August 10, 2024, after the marital residence was sold but before closing, Brian allowed the new owners of the marital property to access the barn. They took a video of the barn, which showed some of Jessica's property inside it. The day after closing, when the new owners took possession of the parties' former marital property, the owners permitted Jessica access to the barn. When Jessica entered the barn, her property was missing. The new homeowners denied having access to the property prior to closing and denied removing anything from the barn. The new homeowners also testified that there was no indication that anyone had broken into the barn.

3

{¶ 8} Brian claimed that Jessica had access to the marital barn prior to the closing because she knew the combination to the lock on the barn. Jessica, however, testified that she had been afraid to go to the marital home since May 2021 due to an incident involving Brian. During that incident, Jessica attempted to visit the barn to get some of her things, and Brian blocked her in with his vehicle. He then rummaged through Jessica's vehicle, dragged a fire pit over to her car, put accelerant on it, and lit it, which caused flames to shoot out higher than Jessica's car. Jessica called 911 as a result of the incident. After that, Jessica refused to return to the marital home without Brian's cooperation because she was afraid of him.

{¶ 9} Jessica testified that she never received any of the items listed on Exhibit V. Brian admitted that he never gave Jessica any of her property. Jessica stated that she did not know any of her property had been moved to the barn until she was informed of it by the new buyers at the September 5, 2024 closing. Both parties testified that they did not know where the missing property items were located or what happened to them.

{¶ 10} On February 10, 2025, the magistrate recommended that Brian be held in contempt for failing to cooperate with Jessica to hand over her personal property as ordered by the divorce decree. The magistrate also recommended that Brian be sentenced to 30 days in jail, fined $250.00, and ordered to pay court costs and $200.00 of Jessica's attorney fees. To purge the contempt, Brian was ordered to turn over to Jessica the entirety of her items, undamaged, within 7 days of the magistrate's entry. The trial court adopted the magistrate's decision.

{¶ 11} Brian timely filed general objections and supplemental objections. On October 3, 2025, the trial court issued a decision and final judgment overruling Brian's objections and finding him in contempt of court. The court sentenced Brian to serve

4

30 days in jail and ordered him to pay a $250.00 fine. The court granted Brian the ability to purge his contempt sanctions by providing to Jessica the entirety of her personal property, undamaged, within 7 days of the filing of the entry. The court further ordered Brian to pay Jessica $200.00 for attorney fees and pay court costs. It is from this order that Brian appeals.

## II. Contempt finding was not an abuse of discretion

{¶ 12} Brian's first assignment of error is as follows:

The trial court erred and abused its discretion in its determination plaintiff-appellant, Brian T. Pelfrey, was in contempt of the court's prior orders.

{¶ 13} Brian argues that the trial court erred in two ways. First, according to Brian, the trial court abused its discretion in finding that Jessica demonstrated by clear and convincing evidence that a court order was violated. Second, in the alternative, Brian submits that even if Jessica had met her burden, he established that he was unable to comply with the divorce decree. We disagree.

{¶ 14} In reviewing a finding of contempt, an appellate court must determine whether the trial court abused its discretion. *Abrams v. Abrams*, 2017-Ohio-4319, ¶ 19 (2d Dist.). An abuse of discretion connotes that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 15} "Contempt of court" is defined as "'disobedience of an order of a court. It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions.'" *Denovchek v. Trumbull Cty. Bd. of Commrs.*, 36 Ohio St.3d 14, 15 (1988), quoting *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55 (1971), paragraph one of the syllabus. Whether a contempt is civil or criminal depends largely on the character and purpose of the sanction. *State v.*

5

*Dean*, 2007-Ohio-1031, ¶ 15 (2d Dist.). "'If sanctions are designed to benefit the complainant through remedial or coercive means, then the contempt proceeding is civil.'" *Owais v. Costandinidis*, 2014-Ohio-4103, ¶ 84 (2d Dist.), quoting *Denovchek* at 16. "Normally, contempt proceedings in domestic relations matters are indirect and civil in nature because their purpose is to coerce or encourage future compliance with the court's orders and they concern behavior that occurs outside the presence of the court." *Flowers v. Flowers*, 2011-Ohio-5972, ¶ 10 (10th Dist.), citing *Fidler v. Fidler*, 2008-Ohio-4688, ¶ 11 (10th Dist.).

{¶ 16} To establish a prima facie case of civil contempt, the moving party must prove, by clear and convincing evidence, both the existence of a court order and that the nonmoving party violated it. *Jenkins v. Jenkins*, 2012-Ohio-4182, ¶ 12 (2d Dist.), quoting *Wolf v. Wolf*, 2010-Ohio-2762, ¶ 4 (1st Dist.). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 17} If the moving party establishes a prima facie case of civil contempt, the burden then shifts to the nonmoving party to prove his or her inability to comply with the court order. *Pugh v. Pugh*, 15 Ohio St.3d 136, 140 (1984). The inability to comply must "'be real and not self-imposed, nor due to fraud, sharp practices, or intentional avoidance.'" *DeWitt v. DeWitt*, 1996 WL 125920, *2 (2d Dist. Mar. 22, 1996), quoting *Wagner v. Wagner*, 1987 WL 14271, *3 (2d Dist. July 10, 1987).

{¶ 18} During the pendency of the divorce proceedings, Brian maintained possession of the marital residence. Pursuant to the divorce decree, all items listed in Exhibit V, which were identified as the sole, separate property of Jessica, were acknowledged by the parties

as "located at the marital residence or at the residence of [Brian's] parents." Brian was ordered "to cooperate with [Jessica] in securing those items."

{¶ 19} Despite Jessica's multiple attempts to schedule a time to obtain her property, Brian responded that he would get it to her but never did. Brian testified that he moved Jessica's property from his parents' home to the barn at the marital residence at the end of July or early August, but he never informed Jessica that the property was available for her to retrieve. After the marital residence was sold but before closing, on August 10, 2024, Brian granted the new owners of the marital property access to the barn. They took a video of the barn that showed some of Jessica's property inside the barn. The day after closing, September 6, 2024, when the new owners took possession of the parties' former marital property, the owners permitted Jessica access to the barn. When Jessica entered the barn, her property was gone. The new homeowners stated that they did not remove anything from the barn and there was no indication anyone had broken into the barn.

{¶ 20} Brian attempted to blame Jessica for her inability to retrieve her own property by claiming that she had access to the marital barn prior to the closing because she knew the combination to the lock on the barn. Jessica, however, testified that although she had learned the combination to the realtor's lockbox at the house, she had been afraid to go to the marital home since May 2021 due to the incident where Brian had blocked her vehicle and lit a fire by it. Due to Brian's actions in 2021, Jessica did not return to the marital home until the walkthrough with the realtor in June 2024 and was afraid to return to the property without Brian's cooperation. Moreover, Brian admitted he never informed Jessica that he had moved her property to the barn for her to know that she could have retrieved it.

{¶ 21} Our review of the record shows that there is clear and convincing evidence of a court order that required Brian to cooperate with Jessica in securing her personal property

7

items identified in Exhibit V and of Brian's failure to cooperate with Jessica to secure her property. Brian had possession and access to the marital residence as well as his parents' home where some of Jessica's items were stored. Despite transporting Jessica's property from his parents' residence to the barn, he never informed Jessica that the property was available at the barn to retrieve it. Moreover, he refused to coordinate a time for her to pick up her property even after she requested it. This evidence constitutes a prima facie showing of contempt of court by Brian.

{¶ 22} The burden then shifted to Brian to demonstrate his inability to comply with the court order. Brian argues that there is no evidence that he disposed of Jessica's property and claims that he did not know what happened to it, which justified his non-compliance with the court order. Even if Brian did not know what happened to Jessica's property, he failed to comply with the divorce decree during the lengthy time prior to the items going missing. If he had complied with the court's order, then Jessica would have received her property before it went missing. Therefore, any alleged impossibility in complying with the court's order was of his own making. Notably, the trial court explicitly found Brian's testimony that he did not know what happened to the missing property not credible.

{¶ 23} Brian did not inform Jessica that he had moved her property to the barn and did not cooperate with her so she could have arranged to pick up her property any other way. Nothing prevented Brian from communicating with Jessica to advise her that the property was available for pick up or to schedule a time to meet and exchange the property. Brian failed to demonstrate any impossibility in complying with the divorce decree.

{¶ 24} The trial court did not abuse its discretion when it granted Jessica's contempt motion and found Brian in contempt of the divorce decree. Brian's first assignment of error is overruled.

8

### III. Contempt finding was not against the manifest weight of the evidence

{¶ 25} Brian's second assignment of error states:

The trial court's finding that plaintiff-appellant, Brian T. Pelfrey was in contempt

of the court's prior order was against the manifest weight of the evidence.

{¶ 26} When an appellate court reviews an argument challenging the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except "'in the exceptional case in which the evidence weighs heavily against'" the trial court's judgment. *Id.*, quoting *Martin* at 175.

{¶ 27} Brian's contempt finding is not against the manifest weight of the evidence. Although Brian testified on his own behalf, his defense consisted of an allegation that someone else must have taken the property because he did not know what happened to it. The court found that his statements were not credible. The credibility of the witnesses and the weight to be given to their testimony were matters for the court to resolve. *McKay Machine Co. v. Rodman*, 11 Ohio St.2d 77, 82 (1967). Nevertheless, Brian admitted that he did not notify Jessica that her property was available at the barn after he moved it there, and he refused to coordinate with Jessica to obtain her property despite her requests to do so. We cannot conclude that the trial court lost its way simply because it chose to believe Jessica, who testified at length regarding Brian's failure to abide by the divorce decree, and the new property owners, who verified that Jessica's property was in the barn as of

9

August 10, 2024. Having reviewed the entire record, we cannot conclude that the evidence weighs heavily against a finding of contempt or that a manifest miscarriage of justice has occurred. Brian's second assignment of error is overruled.

## IV. Conclusion

{¶ 28} Having overruled the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J., and HANSEMAN, J., concur.